UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case Number: 13-CV-20417 Moreno-Otazo-Reyes

JEAN EDOUARD HENRIQUEZ,

    Plaintiff,

vs.

TOTAL BIKE, LLC d/b/a DUCATIMIAMI,
DESMOTORI, LLC d/b/a DUCATIMIAMI,
DAVID SEGUIA SIFONTES a/k/a DAVID
SEGUIAS,

    Defendants.
_____/

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

    Defendants, Total Bike, LLC ("Total Bike"), Desmotori, LLC ("Desmotori"), and David Seguias ("Seguias") (collectively, "Defendants"), hereby move for Summary Judgment, and as grounds state as follows:

**STATEMENT OF UNDISPUTED FACTS[1]**

    1.    Total Bike formally did business as DucatiMiami, a retail and service establishment that sold Ducati motorcycles and motorcycle services, maintenance, and repairs performed by trained and certified Ducati technicians. (Complaint at ¶ 3; D.E. No. 17) (Henriquez Depo. at 42:4-6, 48:5-7) (Aff. at ¶¶ 3 and 8).

    2.    In or around October 2011, Desmotori and Total Bike entered into an Asset Purchase Agreement, whereby Desmotori agreed to purchase (among other things) DucatiMiami from Total Bike.[2] (Aff. at ¶¶ 3-6; Exhibit 3).

    3.    On or around July 4, 2012, Total Bike and Desmotori finalized the purchase and transfer contemplated in the APA, and Total Bike sold its assets, including (without limitation) DucatiMiami, to Desmotori. (Aff. at ¶ 7; Exhibit 3).

    4.    Neither Total Bike nor Desmotori has ever operated DucatiMiami as a manufacturer of

---

[1] The Statement of Undisputed facts herein is supported by the record evidence before this Court, *i.e.*, pleadings, discovery responses, the deposition of the Plaintiff (D.E. No. 39), and the Affidavit of David Seguias, individually, and on behalf of Total Bike and Desmotori ("Aff. at __"), attached hereto as **Exhibit A**, all of which are already of record or are being filed with the Court in support of this motion.

[2] Desmotori is a separate and distinct legal entity with no affiliation to Total Bike. (Aff. at ¶ 5; Exhibits 2-3). Total Bike and Desmotori have never shared officers, directors, members, shareholders or executives. (Aff. at ¶ 4-5; Exhibits 2-3).

goods and services, whether motorcycles or otherwise. (Aff. at ¶¶ 8-9) (Henriquez Depo. at 48:5-7).

5.      Following the sale, Desmotori retained certain employees of Total Bike, including Plaintiff Jean Edouard Henriquez ("Plaintiff" or "Henriquez"). (Aff. at ¶ 10) (Henriquez Depo. at 40:2-7).

6.      At all material time periods, Plaintiff was a Level 1 and 2 Ducati Certified Technician, and his primary duties as the head mechanic was to repair and service motorcycles. (Complaint at ¶ 2; D.E. No. 17) (Aff. at ¶¶ 12, 19) (Henriquez Depo. at 14:2-8, 38:6-25, 40:2-4, 41:1-11, 41:22-24, 48:8-10).

7.      Plaintiff was paid bi-weekly[3] on a commission basis with a guaranteed minimum pay as set forth in more detail below. (Complaint at ¶¶ 2, 9, 11, 12; Exhibit A) (Henriquez Depo. at 14:2-8, 14:24-25, 15:1-8, 15:22-25, 16:1-6, 20:14-23, 22:12-18) (Aff. at ¶¶ 11, 13-21; Composite Exhibits 4, 6).

8.      As a commissioned employee for Total Bike, Plaintiff was paid as follows:

   a.   **Commissions on Services Sold**

       i. **April 29 2010 through July 4, 2012** – Plaintiff received a commission on services sold to the customers, which was calculated by multiplying a flat rate of $45.00 an hour by the billed hours assigned for the particular service that was billed to the customers. Under this approach, each job is assigned a certain number of hours for which the customer is charged, regardless of the actual time it takes to perform the job. Plaintiff is given a certain proportion of that charge expressed in terms of $45.00 per billed hour, which equated to a percentage of approximately 43% of the charge to the customer. For example, if the "billed hour" assigned for a service is 5 hours, but Plaintiff completes the service in 4.5 hours, Plaintiff is paid a commission comprised of $45.00 multiplied by the 5 billed hours, not the 4.5 hours. The customer is charged for the 5 billed hours multiplied by the applicable labor rate of $105.00 per billed hour. So that at all times, at the very minimum, Plaintiff is paid for the same number of billed hours that are charged to the customers. As such, Plaintiff's pay is in direct proportion with the fees charged to the customer, *i.e.*, a percentage of the labor component of the fee for the service that Total Bike charged to the customer.

   b.   **Guaranteed Minimum Commission**

       i. **April 29, 2010 through January 5, 2011** – Plaintiff did not receive a guaranteed commission during this payroll period.

       ii. **January 6, 2011 through February 2, 2011** – Plaintiff was guaranteed a commission pay of approximately $2,200 for a two week period, calculated by guaranteeing

---

[3] During certain periods of time, at Plaintiff's request, Plaintiff was given payroll advances, which were subsequently deducted from Plaintiff's bi-weekly payroll. (Henriquez Depo. at 56:1-23) (Aff. at ¶ 13; fn 2). Deductions for payroll advances are identified as "Misc. Pay" in the payroll records, in particular, the Payroll Details. (Aff. at ¶ 13, fn 2; Composite Exhibit 4) (D.E. No. 41-1 and 41-2).

Plaintiff a minimum expected "billed hours" amount of 48.89 for a two week period multiplied by Plaintiff's flat rate of $45.00 an hour, which was paid to Plaintiff regardless of whether Plaintiff met the expected billed hours or not. For example, from January 20, 2011 to February 2, 2011, the total billed hours charged to the customers was 32.88. Therefore, Plaintiff was paid a commission comprised of $45.00 flat rate multiplied by the 32.88 billed hours. However, even though the expected billed hours of 48.89 were not met, Plaintiff was still paid the difference of 16.01 billed hours (48.89 minus 32.88) multiplied by his regular flat rate of $45.00. If the total billed hours charged to the customer exceeded the expected guaranteed minimum of 48.89, Plaintiff would have been paid his flat rate of $45.00 multiplied by the total billed hours above the minimum.[4]

   iii. **February 3, 2011 through May 25, 2011** – Plaintiff's guaranteed commission pay was increased to $2,250 for a two week period, calculated by guaranteeing Plaintiff a minimum expected "billed hours" amount of 50 for a two week period multiplied by Plaintiff's flat rate of $45.00 an hour, which was paid to Plaintiff regardless of whether Plaintiff met the expected billed hours or not. As a different example, from March 17, 2011 to March 30, 2011, the total billed hours charged to the customers was 100.20. Therefore, Plaintiff was paid a commission comprised of $45.00 flat rate multiplied by the 100.20, since the minimum expected guaranteed billed hours was exceeded.

   iv. **May 26, 2011 through January 18, 2012** – Plaintiff was guaranteed a commission pay of approximately $1,000.00 *per week*, calculated by guaranteeing Plaintiff a minimum expected "billed hours" amount of 22.22 *per week* multiplied by Plaintiff's flat rate of $45.00 an hour, which was paid to Plaintiff regardless of whether Plaintiff met the expected "billed hours" or not. For example, from January 5, 2012 to January 18, 2012, Plaintiff was guaranteed a commission pay of $1,000 in Week 1 and a guaranteed commission pay of $1,000.00 in Week 2. However, in Week 1 the total billed hours charged to the customers was only 4.30. Therefore, for Week 1, Plaintiff was paid a commission comprised of $45.00 multiplied by the 4.30 billed hours. However, even though the expected billed hours of 22.22 were not met, Plaintiff was still paid the difference of 17.92 in billed hours (22.22 minus 4.30) multiplied by his regular flat rate of $45.00 in Week 1. In Week 2, the total billed hours charged to customers was 44.85, which exceeded the guaranteed minimum. Since the guaranteed

---

[4] During the pay period of January 6, 2011 to January 19, 2011, Total Bike accidentally neglected to compensate Plaintiff for the expected minimum guaranteed commission of 48.89 billed hours (Plaintiff was only paid on 45.70 "billed hours"). Therefore, during the following payroll period (January 20, 2011 to February 2, 2011), Plaintiff was paid the difference of $143.50, which was marked as "Misc Pay" in the Payroll Details. (Aff. at ¶ 20, fn 4).

12117.12117-001/00352890_1

3

minimum was exceeded, Plaintiff was paid a commission comprised of $45.00 multiplied by the 44.85 billed hours. Therefore, for this two week payroll period, Plaintiff was paid a total commission of $45.00 multiplied by the 67.07 (22.22 for Week 1 and 44.85 for Week 2) billed hours.

      v. **January 19, 2012 through February 1, 2012** – Plaintiff was guaranteed a commission pay of approximately $3,500.00 for a two week period, calculated by guaranteeing Plaintiff a minimum expected "billed hours" amount of 77.77 for a two week period multiplied by Plaintiff's flat rate of $45.00 an hour, which was paid to Plaintiff regardless of whether Plaintiff met the expected "billed hours" or not.

      vi. **February 2, 2012 through February 29, 2012** – Plaintiff did not work during this four (4) week period. However, as explained in more detail below, Plaintiff was paid $7,000.00 for paid time off and as an incentive bonus to Plaintiff to continue working for Total Bike.

      vii. **March 1, 2012 through May 9, 2012** – Plaintiff was guaranteed a commission pay of approximately $2,000.00 for a two week period, calculated by guaranteeing Plaintiff a minimum expected "billed hours" amount of 80 for a two week period multiplied by Plaintiff's *partial* flat rate of $25.00 an hour, which was paid to Plaintiff regardless of whether Plaintiff met the expected billed hours or not. Plaintiff was paid the *remainder* of his flat rate commission, *i.e.*, $20.00, for all billed hours charged to the customers. Further, any billed hours charged to the customers *above* the minimum expected guarantee was paid to the Plaintiff at a flat rate of $20.00 an hour. For example, from March 1, 2012 to March 14, 2012, Plaintiff was paid his guaranteed minimum commission of $2,000.00. The total billed hours during that period charged to the customers were 42.0— *less than* the minimum expected guaranty of 80. Therefore, Plaintiff was paid the remaining flat rate of $20.00 an hour multiplied by the 42.08 billed hours. In essence, Plaintiff continued to be paid his regular $45.00 flat rate for the 42.08 billed hours charged to the customers, and an additional guaranteed commission of $948.00 ((80 – 42.08) multiplied by $25.00 flat rate guaranteed minimum).[5]

      viii. **May 10, 2012 through June 6, 2012** – Plaintiff was guaranteed a commission pay of $4,000.00 for a two week period, calculated by guaranteeing Plaintiff a minimum expected

---

[5] For organizational purposes and clarity, the guaranteed expected minimum compensation was separated in the payroll records, which were prepared and distributed by a third party payroll provider. (Aff. at ¶ 20, fn 5). In particular, the guarantee was identified in the Payroll Details as "Regular" since the Plaintiff would be compensated that amount regardless of the billed hours ultimately billed to the customers. (*Id*.). The remaining commissions were noted on the Payroll Details as a "Bonus", which gave the Defendants the ability to quickly review the payroll records and distinguish the two categories. (*Id*.).

"billed hours" amount of 88.88 for a two week period multiplied by Plaintiff's flat rate of $45.00 an hour, which was paid to Plaintiff regardless of whether Plaintiff met the expected billed hours or not. Plaintiff was paid an additional flat rate commission of $20.00 for all billed hours charged to the customers above the guaranteed expected minimum of 88.88. For example, from May 10, 2012 to May 23, 2012, the total billed hours charged to the customers was 9.45.[6] Even though the billed hours did not reach the expected minimum, Plaintiff still received his guaranteed commission.

    ix.   **June 7, 2012 through July 4, 2012** – Plaintiff's guaranteed commission reverted back to a guaranty of approximately $2,000.00 for a two week period as explained in Paragraph 8(b)(vii).

(Aff. at ¶¶ 11, 20; Composite Exhibits 4-6) (Henriquez Depo. at 14:2-8, 14:24-25, 15:1-8, 15:22-25, 16:1-6, 20:14-23, 22:12-18).

   9.   After Desmotori purchased DucatiMiami from Total Bike, Desmotori continued to pay Plaintiff the same commission on services sold to the customers. (Aff. at ¶ 21). In particular, as a commissioned employee for Desmotori, Plaintiff was paid as follows:

   a.   **Commissions on Services Sold**

    i.   **July 4, 2012 through October 9, 2012** – Plaintiff received the same commission on services sold to the customers as identified in Paragraph 8(a)(i).

   b.   **Guaranteed Minimum Commission**

    i.   **July 4, 2012 through September 11, 2012** – Plaintiff was guaranteed a commission pay of approximately $2,000.00 for a two week period as explained in Paragraph 8(b)(vii) and 8(b)(ix).

    ii.   **September 12, 2012 through September 25, 2012** – Plaintiff was guaranteed a commission pay of $1,600.00 for a two week period, calculated by guaranteeing Plaintiff a minimum expected "billed hours" amount of 64 for a two week period multiplied by Plaintiff's *partial* flat rate of $25.00 an hour, which was paid to Plaintiff regardless of whether Plaintiff met the expected billed hours or not. Plaintiff was paid the remainder of his flat rate commission, *i.e.*, $20.00, for all billed hours charged to the customers.

---

[6] There was a discrepancy with the "billed hours" on a certain invoice during this payroll period. Therefore, commissions were calculated using "actual hours", since "actual hours" actually reflected the true "billed hours". (Aff. at ¶ 20, fn 6).

        iii.     **September 26, 2012 through October 9, 2012**[7] – Plaintiff was guaranteed a commission pay of $1,200.00 for a two week period, calculated by guaranteeing Plaintiff a minimum expected "billed hours" amount of 48 for a two week period multiplied by Plaintiff's *partial* flat rate of $25.00 an hour, which was paid to Plaintiff regardless of whether Plaintiff met the expected billed hours or not. Plaintiff was paid the remainder of his flat rate commission, *i.e.*, $20.00, for all billed hours charged to the customers.

(Aff. at ¶¶ 11, 21; Composite Exhibits 4-6) (Henriquez Depo. at 14:2-8, 14:24-25, 15:1-8, 15:22-25, 16:1-6, 20:14-23, 22:12-18).

    10.    As noted above, at all relevant times from April 29, 2010 through October 9, 2012 (128 Weeks), Plaintiff's compensation expressed in terms of a regular rate of pay or hourly rate was in excess of one and one half times the minimum hourly wage rate. (Aff. at ¶¶ 11, 20-21; Composite Exhibits 4, 6).

    11.    For all applicable periods, the federal minimum wage was $7.25 an hour.

    12.    While continuing to deny Plaintiff's estimate of the average weekly hours worked, Plaintiff has stated that he worked an average of 48 weekly hours for the Defendants. (Complaint at Exhibit A; D.E. No. 17 and 17-1).

    13.    Plaintiff's total compensation during the foregoing period was $158,308.45. (Aff. at ¶¶ 11, 20-21; Composite Exhibits 4 and 6).

    14.    Accordingly, Plaintiff's compensation expressed in terms of an hourly regular rate of pay (even though at all times he was paid on a commission plus differential basis as explained in more detail above) was approximately $25.77 an hour, which was determined by dividing the total hours Plaintiff claims he worked of 6144 hours (128 Weeks x 48 Hours Per Week) by his total compensation of $158,308.45. (Aff. at ¶¶ 11, 20-21; Composite Exhibits 4 and 6).

    15.    At all relevant times from April 29, 2010 through October 9, 2012, 100% of Plaintiff's compensation represented a commission on goods and services, notwithstanding the guaranteed minimum commission. (Aff. at ¶¶ 11, 20-21, 23; Composite Exhibits 4 and 6).

    16.    Plaintiff's billed hour commission structure was directly proportionate to the fees that Defendants charged to its customers. (Aff. at ¶¶ 11, 20-21, 24; Composite Exhibits 4 and 6). Because the number of hours used to calculate Plaintiff's commission (the billed hour multiplied by Plaintiff's flat rate of $45.00) is the same number of billed hours to determine the fee charged to the customer (billed hour multiplied by labor rate charged to customer), Plaintiff's commission is an implicit percentage of the fees charged to the customers. (*Id*. at ¶¶ 11, 14-19, 20-21, 24; Composite Exhibits 4 and 6).

---

[7] Although the payroll period ended on October 9, 2012, Plaintiff's last date of employment was actually October 4, 2012. (Aff. at ¶ 21, fn 7).

12117.12117-001/00352890_1

17.     During every pay period, Plaintiff is provided detailed records of his pay, including, but not limited to, a payroll summary, payroll detail and commission reports (*via* a 611 Technician Billed v Actual Hours record), which reflects the billed hours that Plaintiff would receive a commission for and a correlating repair order number indicating the invoice billed to the customer.  (Aff. at ¶¶ 11, 20-21; Composite Exhibits 4 and 6) (Henriquez Depo. at 51:10-25, 52:1-9) (D.E. No. 41).

18.     The foregoing records allowed the Plaintiff to confirm that Plaintiff received his agreed upon compensation for a representative period, and clearly represented that more than half of Plaintiff's compensation for a representative period represented commission on goods and service.   (Aff. at ¶ 11, 20-21, 26; Composite Exhibits 4 and 6).

19.     In light of Total Bike's and Desmotori's implementation of the flat rate "billed hour" commission structure, including Henriquez's status as a mechanic primarily engaged in servicing vehicles for Total Bike and Desmotori, Plaintiff was classified as an exempt employee under the Fair Labor Standards Act.  (Aff. at ¶ 27).

20.     Plaintiff never objected to this classification.  (Aff. at ¶ 28).  In fact, Plaintiff repeatedly requested modifications and alterations to the commission structure in order to maximize his earnings, specifically, his right to commissions.  (Henriquez Depo. at 20:18-25, 21:1-19, 44:22-25, 45:1-8, 47:19-22) (Aff. at ¶¶ 11, 20-21, 28; Composite Exhibits 4 and 6).  As detailed above, both Total Bike and Desmotori accommodated these requests in order to please Henriquez and ensure his continued employment as a Ducati Certified Technician.  (*Id*.).

21.     Further, to ensure Plaintiff's happiness and continued employment, both Total Bike and Desmotori regularly provided Plaintiff weekly payroll advances at his request.[8]  (Henriquez Depo. at 56:1-23) (Aff. at ¶ 11, 29; Composite Exhibits 4 and 5).

22.     Moreover, during Plaintiff's employment, both Total Bike and Desmotori allowed Plaintiff to continue operating his own company, Desmomaniacs Racing, Inc. ("Desmomaniacs").[9]  (Aff. at ¶ 30-32; Composite Exhibit 5) (Henriquez Depo. at 9:9-14).

23.     Unrelated to Plaintiff's employment with either Total Bike or Desmotori, Plaintiff (through Desmomaniacs) regularly purchased and sold goods and services from and to the Business on an account.[10]  (Henriquez Depo. at 56:24-25, 57:1-25, 58:25) (Aff. at ¶ 31; Composite Exhibit 5).

---

[8] Payroll advances were deducted from Plaintiff's bi-weekly paychecks at Plaintiff's request.  (Aff. at ¶ 29, fn 9; Composite Exhibits 4 and 5) (Henriquez Depo. at 56:1-23).

[9] True and correct copies of Desmomaniacs online records with the Florida Department of State, Division of Corporations, including the Articles of Incorporation, are attached hereto as **Exhibit B**.  Defendants request that the Court take judicial notice of Desmomaniacs corporate records.

[10] At Plaintiff's request, Plaintiff would pay for purchases from DucatiMiami *via* payroll deductions from Plaintiff's payroll.  In addition, at Plaintiff's request, DucatiMiami would compensate Plaintiff and Desmomaniacs for any purchases DucatiMiami made from Desmoniacs *via* a reduction of any accounts

24. In order to track any deductions to Plaintiff's payroll, the deductions were marked as "Misc pay" in Plaintiff's earning statements (D.E. No. 41-1 and 41-2 at PLA 00124 – PLA 000277) and in Defendants' payroll records, *i.e.*, the Payroll Details (Aff. at ¶¶ 11, 31; Composite Exhibit 4).

25. Like the commission structure implemented for Plaintiff, these advances and credit extensions were done for Plaintiff's benefit. (Henriquez Depo. at 56:1-25, 57:1-8, 57:22-25, 58:1-24) (Aff. at ¶¶ 28-29).

26. Notwithstanding Plaintiff's exempt status, on February 4, 2013, Plaintiff filed suit against the corporate Defendants on February 4, 2013 seeking to recover under the Fair Labor Standards Act, 29 U.S.C. §§201-219 (the "FLSA"). (D.E. Nos. 1 and 17). In addition, Plaintiff sought to hold Seguias, individually, liable for the claims brought against the corporate Defendants. (D.E. Nos. 1 and 17).

27. On May 20, 2013, Plaintiff filed his Amended Complaint and Statement of Claim, which asserted $32,853.00 in damages, including liquidated damages, for unpaid overtime and unpaid commissions. (D.E. No. 17 at ¶¶ 11-12; Exhibit A).

28. Plaintiff served his Federal Rule of Civil Procedure 26(a) Initial Disclosures, which directed the Defendants to see "Plaintiff's Statement of Claim" filed as an attachment to Plaintiff's Amended Complaint. (D.E. No. 40).

29. As more fully set forth below, the undisputed record evidence, including the testimony of Plaintiff, supports the entry of summary judgment in favor of the Defendants.

## MEMORANDUM OF LAW

The FLSA requires employers to pay covered employees an overtime premium of one and one-half times the employee's regular rate of pay for any hours worked in excess of forty (40) in one week. See 29 U.S.C. § 207(a)(1). However, if an employee is exempt from the FLSA, the employee is not entitled to overtime pay. Plaintiff is an exempt employee under 29 U.S.C. § 213(b)(10)(A), which is commonly referred to as the mechanics exemption or 13(b)(10)(A), and 29 U.S.C. § 207(i), which is commonly referred to as the retail service commission exemption or the 7(i) exemption.

### I. LEGAL STANDARD

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Wouters v. Martin County, 9 F.3d 924, 928 (11th Cir. 1993), *cert. denied*, 115 S. Ct. 65 (1994) (citation omitted). As this Court noted in Alvarado v. I.G.W.T. Delivery Systems, Inc., 410 F.Supp.2d 1272, 1275 (S.D.Fla., Jan. 17, 2006):

> Summary judgment is authorized where there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Adickes v. S.H. Kress &

---

receivable or debt owed by Plaintiff to DucatiMiami. (Henriquez Depo. at 56:24-25, 57:1-25, 58:25) (Aff. at ¶ 31, fn 10; Composite Exhibits 4 and 5).

12117.12117-001/00352890_1

8

Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings, the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position.

See also Early v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

## II.   PLAINTIFF IS EXEMPT UNDER 29 U.S.C. § 213(b)(10)(A)

29 U.S.C. § 213(b)(10)(A) provides, in pertinent part, that the "provisions of section 207 of [the FLSA] shall not apply with respect to:

> [A]ny…mechanic primarily engaged in…servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers…"

Whether Plaintiff falls within the scope of the mechanics exemption is "ultimately a legal question." Viart v. Bull Motors. Inc., 149 F. Supp. 2d 1346, 1349 (S.D. Fla. 2001) (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 713-14(1986)). As such, the mechanics exemption under 13(b)(10)(A) applies if the Court determines that Desmotori and/or Total Bike: (a) are/were a non-manufacturing establishment engaged in the sale of automobiles; and (b) employed Plaintiff as a mechanic who was primarily engaged in selling or servicing automobiles. Id. As both of these requirements have been satisfied, Plaintiff is exempt from overtime coverage.

### A.   Defendants Are/Were a Non-Manufacturing Establishment Primarily Engaged in the Business of Selling Automobiles to Ultimate Purchasers

Defendants readily satisfy the requirement that they are a "nonmanufacturing establishment primarily engaged in the business of selling [automobiles]…to ultimate purchasers." 29 U.S.C. § 213(b)(10(A). Plaintiff acknowledges that Defendants are a non-manufacturing establishment. (Henriquez Depo. at 48:5-7) (Aff. at ¶ 9). Further, the record evidence, including the testimony of Plaintiff, clearly demonstrates that Defendants are/were primarily engaged in the retail sale of Ducati motorcycles to the general public and the ultimate end users, including the service of said vehicles. (Aff. at ¶¶ 3, 8) (Henriquez Depo. at 42:4-6) (Complaint at ¶¶ 3-4; D.E. No. 17) ("[The corporate Defendants were] engaged in commerce in the field of motorcycle repairs and sales…").

### B.   Plaintiff is a Mechanic Primarily Engaged in Servicing Automobiles

Following its determination that Defendants are a nonmanufacturing establishment covered by § 213(b)(10)(A), this Court must decide whether Plaintiff can be classified as a "mechanic" under the exemption. Plaintiff alleges and has testified that he was a certified "mechanic" primarily engaged in

servicing and repairing automobiles.  (Complaint at ¶ 9) (Henriquez Depo. at 14:2-8, 40:23-25, 41:1-5, 41:22-24, 48:8-10) (Aff. at ¶ 12).

### C. Motorcycles are Automobiles Under § 213(b)(10)(A)

Section 213(b)(10)(A) does not define "automobile".  It is anticipated that Plaintiff will argue that a motorcycle is not an automobile.  However, since there is no statutory definition, this Court "is not required to accept as true the [Plaintiff's] interpretation of the statutory term."  Grabein v. 1-800 Flowers.com, Inc., 2008 WL 343179 *2 (S.D.Fla., Jan. 29, 2008).  Instead, the word "automobile" is to be given its ordinary and plain meaning.  Id.

> "The word 'automobile' is derived from the Greek word 'autos' meaning self, and the Latin word 'mobilis' freely movable, signifying self-moving or self-movable, changing its own place or able to effect a change of its own place.  The term "automobile" is applied generally to a self-moving vehicle designed to travel on common roads, and specifically, to a wheeled vehicle for use on roads without rails, which carries itself a mechanical motor with its source of power.  ***A 'motorcycle' is a vehicle 'of like character' with an automobile…***"

Wright v. Beacon Mutual Indemnity Co., 179 N.E.2d 547, 552 (Ohio Com. Pl. 1961) (emphasis added).  Similar to Wright, courts, including the Florida state courts, have found a "motorcycle" to be within the ordinary and plain meaning of the word "automobile", especially in circumstances where the term automobile is not limited to a specified type of vehicle.  See, e.g., Dorrell v. State Fire & Casualty Co., 221 So. 2d 5, 6 (Fla. 3d DCA 1969) (holding that a "motorcycle is considered an automobile" under Florida law, unless the parties specifically limit the definition of the term to exclude motorcycles); Ferguson v. Jenkins, 204 S.W.3d 779 (Tenn. Ct. App. 2006), *appeal denied*, (Sept. 25, 2006) (holding that a motorcycle was an "auto" under the policy, which defined an "auto" as land motor vehicle, and the motorcycle was a self-propelled wheeled conveyance that did not run on rails and was operated on solid ground of the earth).

By its very nature and origins, the ordinary and plain meaning of the word "automobile" encompasses motorized vehicles such as "motorcycles".  Interpreting "automobile" to include "motorcycles" does not render the statutory remedy of the FLSA ineffectual or easily evaded, since both a car and a motorcycle, including the mechanics who repair and service these vehicles, are within a small industry and class of persons performing substantially the same tasks on similar vehicles.  See, e.g., Yi v. Sterling Collision Centers, Inc., 480 F.3d 505, 508 (7th Cir. 2007) (interpreting the term "commission" under the exemption of 7(i) to include a wide range of pay methodologies, including pay structures that are not labeled as commissions by the parties, even though the FLSA does not define what a bona fide commission is).  In fact, there exists no distinction between a mechanic primarily engaged in servicing cars and a mechanic primarily engaged in servicing motorcycles.  A motorcycle is a self-moving, wheeled vehicle designed to travel on roads without rails that has a mechanical motor with a source of power,

which fits squarely within the original, plain and ordinary meaning of automobile.

In light of the foregoing, including the record evidence before this Court, summary judgment is proper pursuant to 29 U.S.C. § 213(b)(10)(A).

### III. PLAINTIFF IS EXEMPT UNDER 29 U.S.C. § 207(i)

In the alternative, and even assuming the mechanic's exemption under 13(b)(10)(A) is inapplicable, Plaintiff was properly compensated and classified as an exempt employee under the FLSA. Among the varied exemptions to the FLSA's overtime provisions, the FLSA provides that an employer is not required to pay overtime to an employee of a retail or service establishment if certain elements under 29 U.S.C. § 207(i) are satisfied.

For the 7(i) exemption to apply, three elements must be satisfied:

(1) The employer must be a retail or service establishment;

(2) The regular rate of pay of the employee has to be in excess of one and one-half times the minimum hourly rate applicable to him under 29 U.S.C. § 206; and

(3) More than half of the employee's compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). The three elements for the 7(i) exemption are readily satisfied, leaving no doubt that Plaintiff is exempt from the FLSA overtime pay requirements.

#### A. Defendants Are a Retail or Service Establishment

First, Total Bike and Desmotori, which sold/sell motorcycles and motorcycle services, maintenance, and repairs, are considered a "retail or service establishment." (Complaint at ¶¶ 3-4; D.E. No. 17) (Aff. at ¶ 3, 8) (Henriquez Depo. at 42:4-6). Typically, a retail or service establishment is one which sells goods or services to the general public. See 29 C.F.R. § 779.318(a); see also 29 C.F.R. § 779.320 (including repair shops in the non-comprehensive list of examples of retail and service establishments; Yi, 480 F.3d 505 (applying the 7(i) exemption to body repair shops). Plaintiff has confirmed that Defendants satisfy this requirement. (Henriquez Depo. at 42:4-6).

#### B. Regular Rate of Pay Exceeded One and One-Half Times the Minimum Hourly Rate

Second, the corporate Defendants' time and pay records indisputably demonstrate that, with a guaranteed minimum pay during a majority of Plaintiff's employment, Plaintiff earned in excess of one and one-half times the federal minimum wage required under 29 U.S.C. § 206, which at all material times, was $7.25. Plaintiff's compensation expressed in an hourly rate or regular rate of pay is derived by dividing Plaintiff's total hours worked per pay period by his total compensation per same pay period. See 29 C.F.R. § 779.419(b) (citing Overnight Motor Co. v. Miseel, 316 U.S. 572 (1942)).

Here, Plaintiff alleges that he worked an average of Forty-Eight (48) hours per week. (D.E. 17-1; Complaint at Exhibit A). Taking Plaintiff's estimate as true for the purposes of this Motion for Summary Judgment, a review of Plaintiff's total compensation conclusively demonstrates that Plaintiff was always

paid in excess of one and one-half times the applicable federal minimum wage. (Aff. at ¶¶ 11, 20-21, 22; Composite Exhibits 4 and 6). For example, using a payroll period (April 29 2010 to May 12, 2012) when Plaintiff was not provided a guaranteed expected minimum, Plaintiff's regular rate of pay was $17.02 an hour [$1,633.50 (total compensation) / (2 weeks x 48 hours per week)]. (Id.). Using a different payroll period (May 26, 2011 to June 8, 2011) from when Plaintiff was given a guaranteed minimum, Plaintiff's regular rate of pay was $27.88 an hour [$2,676.15 (total compensation) / (2 weeks x 48 hours per week)]. (Id.) Even taking Plaintiff's total compensation, $158,308.45, during the entire term of his employment, 128 Weeks,[11] Plaintiff's compensation expressed in terms of an hourly regular rate of pay (even though at all times he was paid on a commission plus differential basis) was approximately $25.77 an hour [$158,308.45 (total compensation) / (128 weeks x 48 hours per week)]—over three (3) times the minimum wage rate. (Id.).

### C. More Than One-Half of Plaintiff's Compensation Consisted of Commissions

Third, the determination of the final element for 7(i) exemption requires an analysis as to: (1) whether Plaintiff's commissions were from a bona fide commission rate; and (2) whether more than half of Plaintiff's compensation for a representative period longer than one month is from commissions. See 29 U.S.C. § 207(i). Defendants' commission structure constitutes a bona fide commission rate and more than half of Plaintiff's compensation is from commissions.

#### (1) Plaintiff's Commissions Were a Bona Fide Commission

"The function of a commission exemption as embodied by section 7(i) is to ensure that workers who are paid on a commission basis receive at least the legislated minimum wage without requiring them to work overtime for it." Klinedinst. v. Swift Investments, Inc., 260 F.3d 1251, 1256 (11th Cir. 2001). The FLSA does not define commissions and the case law is relatively sparse as to the definition of commissions for purposes of the 7(i) exemption. However, a few cases have provided thorough and thoughtful analyses as to what constitutes a bona commission rate. See, e.g., Klinedinst, 260 F.3d at 1254-1256; Yi, 480 F.3d at 508 (7th Cir. 2007) (holding that the word "commission" does "not need to be used [by the employer or employee] for the [7(i)] exemption to be applicable); Parker v. Nutrisystem, Inc., 2009 WL 2358623 (E.D. Pa. 2009); Lee v. Ethan Allen Retail, Inc., 651 F.Supp.2d 1361 (N.D. Ga 2009); Horn v. Digital Cable & Comm., Inc., 2009 WL 4042407 (N.D. Ohio 2009). Although these cases address various types of commission plans, the consensus is that commissions based on a percentage of fees charged to the customers are bona fide commissions for the 7(i) exemption. See Yi, 480 F.3d at 508 ("The essence of a commission is that it bases compensation on sales, for example a percentage of sales price, as when a real estate broker receives as his compensation a percentage of the price at which the

---

[11] Although Plaintiff's employment ended before the start of week two (2) of the last payroll period, for the purposes of this Motion, Defendants include week two (2) as part of Plaintiff's employment term.

property he brokers is sold."); Horn, 2009 WL 4042407 at *5 ("[A] compensation system wherein, Plaintiffs earn a percentage of the value of each service performed, and their weekly income therefore fluctuates based on volume and consumer demand, falls squarely within the policy rationale behind the retail service commission employee exemption [Section 7(i)]."). Courts have held that a commission rate is "bona fide" where the employer sets the rate in good faith. Erichs v. Venator Group, Inc., 128 F.Supp.2d 1255, 1259 (N.D.Cal. 2001); Herman v. Suwannee Swifty Stores, Inc., 19 F.Supp.2d 1365, 1370 (M.D.Ga. 1998).

In good faith, the Defendants utilized a bona fide commission plan to pay Plaintiff. As detailed above, Plaintiff's commission was in the form of a flat rate "billed hour" system in which Plaintiff was paid a total minimum of $45.00 an hour for all "billed hours" assigned to a particular service and ultimately billed to the Defendants' customers. (Henriquez Depo. at 14:2-8, 14:24-25, 15:1-8, 15:22-25, 16:1-6, 20:14-23, 22:12-18) (Aff. at ¶¶11, 14-21; Composite Exhibits 4 and 6). In particular, the Defendants calculate the number of hours normally required to perform a given type of service or repair (these are called "billed hours") and multiply that number by a dollar figure (*i.e.*, the labor rate). (Aff. at ¶¶ 14-15). The product of this multiplication is the labor price of the service or repair to the customer. (Aff. at ¶ 15). A mechanic (or team of mechanics) is then assigned to the job. (Aff. at ¶¶ 16-17). Each mechanic works in tandem with the service manager to keep track of the hours he/she works on the job. (Aff. at ¶ 17). When it is completed and the hours of the team members are added up, Defendants determine each member's compensation by multiplying the total number of "billed hours" for the job by the member's commission rate, commonly referred to in the industry as the mechanic's "flat rate", which was based on the skill or quality of the individual mechanic. (Aff. at ¶¶ 17-19). Plaintiff was the head mechanic, and was the only Ducati Certified Technician employed by Defendants during the respective time periods. (Aff. at ¶ 19) (Henriquez Depo. at 45:3-8). As such, Plaintiff's flat rate was $45.00 an hour, which was the equivalent of paying Plaintiff approximately 43% of the labor component of the price of the service or repair charged to the customer. (Henriquez Depo. at 14:2-8 ("…I worked there as a mechanic for I guess what you would call flat rate, you know, which is them paying for hours that they bill…"), 14:24-25, 15:1-8, 15:22-25, 16:1-6, 20:14-23, 22:12-18).

In Klinedinst, 260 F.3d at 1254-1256, the Eleventh Circuit assessed a flat rate commission pay system similar to Defendants'. There, the plaintiffs were painters for a repair and body shop, and were compensated according to a repair estimate. *Id.* at 1253. "The labor portion of the estimate was calculated by multiplying 'flag hours' [*i.e.*, hours to be charged to the customers] by the auto shop's hourly rate." *Id.*

> [T]he[] [flag hours] did not necessarily reflect the actual time spent completing a job. If more than or fewer than the predetermined number of flag hours were required to complete a job, [the employer] would nevertheless pay the painter for the predetermined

number of hours even though he did not actually work that many hours.
Id. Like Plaintiff, Klinedinst was paid for each paint job he performed based on the following formula: the "flag hours" allotted to the paint labor component of the repair estimate multiplied by his hourly flat rate. Id.

The Eleventh Circuit considered the plain meaning applied to the word "commissions," and quoted the Wage and Hour Division of the Department of Labor's Field Operations Handbook, Section 21h04(d):

> Some auto service garages and car dealerships compensate mechanics and painters on the following basis: the painter or mechanic gets so much a "flat rate" hour for the work he or she performs. A "flat rate" hour is not an actual clock hour…Each job is assigned a certain number of hours for which the customer is charged, regardless of the actual time it takes to perform the job. The employee is given a certain proportion of that charge expressed in terms of so many dollars and cents per "flat rate" hour rather than in terms of a percentage of the charge to the customer.

Klinedinst, 260 F.3d at 1255-1256. The Eleventh Circuit found that a flat rate commission structure constitutes a commission for the purposes of the 7(i) exemption. Id. at 1256.

After Klinedinst, the Seventh Circuit also addressed a similar flat rate commission system for mechanics in Yi. Following Klinedinst, the court concluded that a flat rate commission structure constitutes a bona fide commissions. In Yi, the plaintiffs were repair technicians who were paid under a "booked hour" system, which was very similar to the "flag hours" system in Klinedinst and the "billed hours" system used by Defendants. The defendant charged its customers a labor price based on the number of hours normally required to do the job multiplied by a dollar figure. A team of mechanics would work on the job, and the defendant compensated the mechanics by "multiplying (1) the number of booked hours for the job by (2) the ratio of the team member's actual hours worked to the total hours, and then by (3) a wage, per booked (not actually worked) hour, based on the skill or quality of the individual team member." Id. at 509.

Utilizing the above, commissions are decoupled from the actual time worked and "[t]he percentage rate is implicit in [defendant's] method of compensation." Id. at 509. Even though the plaintiff's flat rate was not expressed in terms of a percentage, it was equivalent to paying the plaintiff a percentage (43% percent in the underlying case) of the labor component of the price of their service to the customer. Id. The Seventh Circuit emphasized that finding mechanics to be exempt employees comported with the rationales underlying the 7(i) exemption. Id. at 509-510. Finally, the court specifically noted that such commission plans are standard in the repair and service industry and constitute a bona fide commission structure:

> [t]he system of compensation used by [defendant] [*i.e.*, a flat rate commission] is industry wide, and of long standing…It is possible for an entire industry to be in violation of the Fair Labor Standards Act for a long time without the Labor Department noticing. **But a**

> *more plausible hypothesis is that the auto repair industry has been left alone because the character of its compensation system has been recognized for what it is - a bona fide commission system*.

*Id*. at 510-511 (emphasis added) (citations omitted). Thus, the court concluded that the flat rate commission based on "booked hours" constituted bona fide commissions and the 7(i) exemption applied. *Id*.

Plaintiff's employment, like those in Klinedinst and Yi, was based on a flat rate "billed hour" commission structure. Defendants assigned a certain number of hours, *i.e.*, "billed hours", for a job to be completed and for which the customer is charged. Like the employees in Klinedinst and Yi, Plaintiff (as the only Ducati Certified Technician) was given a certain proportion of that charge expressed in terms of a $45.00 flat rate per "billed hour", a flat rate substantially greater than the employees in Klinedinst and Yi.

Defendants' commission structure, inclusive of the guaranteed minimum, is in line with industry standards as a recognized bona fide commission plan and satisfied the FLSA for purposes of the exemption. Payment of a guaranteed minimum commission is irrelevant, and, as explained above, this compensation structure only increased the compensation paid to Plaintiff, who was a highly trained and skilled employee. Pursuant to 29 U.S.C. § 207(i), any compensation calculated as commission according to a bona fide commission plan qualifies as commission "even though the amount of commissions may not equal or exceed the guarantee…in some workweeks." See 29 C.F.R. § 779.416(b); 29 U.S.C. § 207(i) ("all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether commissions exceed the draw or guarantee.").

### (2) More Than Half of Plaintiff's Compensation Was From Commissions

Plaintiff's commissions constituted more than half of his pay as required for the 7(i) exemption. In 2010, 2011 and 2012, 100% of Plaintiff's compensation was from commissions pursuant to a bona fide commission plan. (Aff. at ¶ 11, 20-21, 23; Composite Exhibits 4 and 6). As discussed above, Plaintiff was paid under the well-established "flat rate" system utilized widely within the repair and service industry. See Kinedinst, 260 F.3d at 1253; Yi, 480 F.3d at 508-510. "The overtime provisions of [the] FLSA hardly seem to [have been] enacted to protect such [a] well-paid, skilled worker []." Dong Yi v. Sterling Collision Centers, Inc., 2006 WL 1444897, *6 (N.D.Ill., May 17, 2006). In Dong Yi, the court noted in its opinion that it was "interesting that [the] extremely well compensated technicians waited until they left [the defendant's employment] to complain about the lack of overtime[]" and that the technicians would have earned substantially less money "if they been compensated by wages at time and one-half" instead of the commission structure implemented by the defendant. *Id*. at *6, fn 2. Similarly, here, Plaintiff was well compensated under the commission structure implemented by the Defendants (which was done at Plaintiff's request) and he would have earned significantly less money if compensated on a

regular hourly rate, including a rate of time and one-half for overtime.  *Id*.  Therefore, the 7(i) exemption applies.

### IV. <u>PLAINTIFF HAS NO DAMAGES</u>

Having established above that Plaintiff is not entitled to overtime wages pursuant to 29 U.S.C. §§ 207(i) and 213(b)(10)(A), Defendants are also entitled to summary judgment as to damages claimed for unpaid commissions.

On February 6, 2013, the Court entered its Notice of Court Practices in FLSA Cases.  (D.E. No. 4).  Specifically, the Court ordered the Plaintiff to "file a <u>short</u> statement of claim setting forth the ***total amount of alleged unpaid wages, the calculation of such wages (number of hours multiplied by the rate of pay along with corresponding date(s) such wages were earned), <u>and the nature of the wages (e.g., minimum or overtime</u>) no later than February 28, 2013***."  (*Id*.) (emphasis added).  Further, the Court directed the Plaintiff to file an amended statement of claim "*[n]o later than <u>five days after the close of discovery</u>*."  (*Id*.) (emphasis added).  In addition, Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure required the Plaintiff to provide "a computation of ***<u>each category</u> of damages*** claimed by the disclosing party…" (emphasis added).

On May 20, 2013, Plaintiff filed his Amended Complaint, which attached Plaintiff's Statement of Claim as Exhibit A thereto.[12]  (D.E. No. 17 at ¶ 11-12; Exhibit A).  Plaintiff disclosed therein that he was seeking $32,853.00 in damages, including liquidated damages, for unpaid overtime and unpaid commissions.  (*Id*.).  Additionally, Plaintiff served his Federal Rule of Civil Procedure 26(a) Initial Disclosures, which directed the Defendants to see "Plaintiff's Statement of Claim" filed as an attachment to Plaintiff's Amended Complaint.  (D.E. No. 40) (D.E. No. 17 at ¶11-12; Exhibit A).

In deposition, Plaintiff testified (for the first time) that his Statement of Claim was incorrect and that he was unable to provide any evidence regarding the amount or type of damages he was seeking in this action.  (Henriquez Depo. at 34:18-25, 35:1-25, 36:1-8).  Further, contrary to every representation made by the Plaintiff in his initial Complaint (D.E. No. 1 at ¶¶ 11-12; Exhibit A), the Amended Complaint (D.E. No. 17 at ¶¶ 11-12; Exhibit A) and Plaintiff's Rule 26(a) Initial Disclosures (D.E. No. 40), Plaintiff surprisingly testified that he was not a commissioned employee and, as such, was not suing for unpaid commissions.  (Henriquez Depo. at 22:19-25, 23:1, 26:20-25, 27:1-17, 34:22-24).  Plaintiff also testified that the unpaid commissions section in his Statement of Claim was not correct.  (*Id*.).  Notwithstanding, Plaintiff has failed to timely file an amended statement of claim pursuant to the Court's Notice of Court Practices in FLSA Cases.  Discovery in this matter closed on September 13, 2013 (D.E.

---

[12] "Where the allegations of the complaint are expressly contradicted by the plain language of an attachment to that complaint, the attachment controls, and the allegations are nullified."  <u>Degirmenci v. Sapphire-Fort Lauderdale, LLLP</u>, 693 F.Supp.2d 1325, 1341 (S.D.Fla. 2010) (citations omitted).

No. 25 at ¶ 4), therefore, making September 18, 2013 the deadline for filing any amended statement of claim. Not only has Plaintiff provided both this Court and the Defendants false information regarding the claims and category of damages he is seeking in this action in violation of Rule 26(a) and this Court's Notice of Court Practices, as of the date of this Motion, Plaintiff has failed to file an amended or corrected statement of claim.

Having confirmed he is not seeking unpaid commissions in this lawsuit, Defendants are entitled to summary judgment.

## V.    PLAINTIFF IS NOT ENTITLED TO LIQUIDATED DAMAGES AND/OR EXTENSION OF APPLICABLE LIMITATIONS PERIOD

While Defendants continue to deny any liability under the FLSA in this matter, in the event that Plaintiff does not qualify for either the mechanics exemption or the retail service commission exemption, the evidence demonstrates that the imposition of liquidated damages and/or the three (3) year statute of limitations is not appropriate in this case.

### A.    Liquidated Damages

Section 16(b) of the FLSA provides that any employer who violates the overtime provisions "shall be liable to the employee or employees affected in the amount of their…unpaid overtime compensation…and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). A court may refuse to award liquidated damages, however, if the employer shows that the act or omission giving rise to the action was in good faith and that it had reasonable grounds for believing that its act or omission was not a violation of the FLSA. Olson v. Superior Pontiac-GMC, Inc., 765 F.2d 1570, 1579 (11th Cir. 1985), *modified on other grounds*, 776 F.2d 265 (11th Cir. 1985). "The employer must plead and prove that the act or omission complained of was: (1) in good faith; (2) in conformity with; and (3) in reliance on an administrative regulation, order, ruling, approval, or interpretation of an agency of the United States." Id.

### B.    Statute of Limitations

29 U.S.C. § 255(a) requires a "willful violation" to extend the statute of limitations beyond two years, not simply a finding of knowledge. The important nature of the distinction is clearly established by the United States Supreme Court in McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988). Specifically, in describing the purpose and distinction of the two tiered statute of limitations under the FLSA, the Supreme Court stated: "The fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a ***significant distinction* between *ordinary violations and willful violations***." McLaughlin, 486 U.S. at 132 (emphasis added). In McLaughlin, the Supreme Court rejected the standard previously adopted by the Fifth Circuit that a mere showing of knowledge of the FLSA is enough to

extend the statute of limitations for a willful violation.  <u>Id</u>. at 131-32 ("It is equally obvious…that the Jiffy June standard of willfulness…virtually obliterates any distinction between willful and non-willful violations.").  The Supreme Court went on to define willfulness for purposes of the FLSA as follows:  "In common usage the word 'willful' is considered synonymous with such words as '***voluntary***,' '***deliberate***,' and '***intentional***.'  The word "willful"…is generally understood to refer to conduct that is ***not merely negligent***."  <u>Id</u>. (emphasis added); <u>Reich v. Department of Conservation and Natural Resources, State of Ala.</u>, 28 F.3d 1076 (11th Cir. 1994).

### C. Any Violations Were Committed Without Knowledge and in Good Faith

Contrary to his allegations, Plaintiff confirmed that Defendants accommodated Plaintiff's requests to be paid more money by continuously modifying Plaintiff's commission structure (as detailed above).  (Henriquez Depo. at 20:18-25, 21:1-19, 44:22-25, 45:1-8, 47:19-22).  Further, Defendants: (a) regularly provided Plaintiff payroll advances at Plaintiff's request even though Defendants were not required to; (b) allowed Plaintiff to purchase goods and services on account through extensions of credit even though Defendants were not required to; (c) allowed Plaintiff to continue operating a separate business during his employment; and (d) Total Bike's owner even loaned Plaintiff money so Plaintiff could fix his car.  (<u>Id</u>. at 20:24-25, 21:1-19, 45:3-8, 45:15-22, 47:16-22, 56:1-23, 57:1-25, 58:1-24).

The undisputed evidence reflects that Defendants acted in good faith throughout Plaintiff's employment so as to prevent liquidated damages, and did not willfully violate the FLSA so as to extend the statute of limitations beyond two (2) years.  Moreover, even if Plaintiff is not exempt under either the 13(b)(10)(A) or 7(i) exemption, Defendants relied on the foregoing exemptions, including customary and standard industry practices related to repair shops, when compensating the Plaintiff (a mechanic) under what they believed to be a bona fide commission structure.

WHEREFORE, Defendants, Total Bike, LLC, Desmotori, LLC, and David Seguias, respectfully request this Honorable Court enter summary judgment in favor of Defendants as to all claims brought by the Plaintiff, Jean Eduoard Henriquez, and/or enter an order striking Plaintiff's claim for liquidated damages and any request for an extension of the statute of limitations beyond two (2) years, and for such other and further relief as this Court deems just and proper.

**CERTIFICATE OF SERVICE**

       I HEREBY CERTIFY that on September 30, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Elliot Kozolchyk, Esq.
Florida Bar No. 74791
ekoz@kozlawfirm.com
Koz Law, P.A.
80 S.W. 8th Street, Suite 2000
Miami, FL 33130
786-924-9929 Telephone
786-358-6071 Facsimile

    /s/ Christopher Jallo
**Christopher Jallo, Esq.**
Florida Bar No. 0072555
E-mail: jallo@kolawyers.com
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG KEECHL**
*Attorneys for Defendant*
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, FL 33301
(954) 525-4100 – Telephone
(954) 525-4300 – Facsimile